**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| PIPE & BOILER INSULATION, INC., by and through its duly appointed Receiver Peter D. Protopapas,<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL INSURANCE COMPANY, FORMERLY KNOWN AS NIAGRA FIRE INSURANCE COMPANY; et al.,<br><br>Defendants. | C/A No. 3:21-cv-03033-MGL<br><br>**PLAINTIFF PIPE & BOILER INSULATION, INC.'S, BY AND THROUGH ITS DULY APPOINTED RECEIVER PETER D. PROTOPAPAS, REPLY TO DEFENDANT ARROWOOD INDEMNITY COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT** |

Plaintiff Pipe & Boiler Insulation, Inc. ("Plaintiff" or "Pipe & Boiler"), by and through its duly appointed Receiver Peter D. Protopapas (the "Receiver"), respectfully submits this reply to Defendant Arrowood Indemnity Company's ("Arrowood") Response in Opposition to Plaintiff's Motion for Leave to File an Amended Complaint ("Opposition").

Arrowood is entitled to its very strong opinions about the Receiver, the Receivership Court, and Arrowood's obligations, but, stripped of hyperbolic opinion, the facts surrounding the formation of PBI QSF, LLC ("PBI QSF") and the law regarding qualified settlement fund ("QSF") implementation establishes that amendment of the complaint to add the PBI QSF is warranted.

### Background

In August 2021, the Receiver for Pipe & Boiler filed the instant action in state court against Pipe & Boiler's known legacy insurers and broker. The state court action sought declaratory judgments from the Receivership Court regarding the interpretation of the terms of the company's historical insurance policies. The Receiver's requested policy interpretation is essential to the Receiver's purpose: to marshal the assets of Pipe & Boiler for the purposes of paying legitimate

1

asbestos personal injury claims brought by plaintiffs who were exposed to asbestos by Pipe & Boiler's historic business operations.

Since this initial filing, the Receiver learned more about the existence of a separate insurance program for a previously independent affiliate, namely Carolina Industrial Insulation. *See* Exhibit 1, Affidavit of Peter Protopapas ("Protopapas Aff.") ¶ 39. Based on this information, the Receiver filed a state court insurance coverage case against Carolina Industrial's legacy insurers, including Zurich American Insurance Company ("Zurich"), in February 2022. *See id.*

In April 2022, the Receiver reached a comprehensive settlement with Zurich. *Id.* ¶ 40, Ex. 8. As previously described, the settlement agreement included the creation of a QSF, the PBI QSF, both to hold and administer the settlement proceeds and to administer the contribution rights of Zurich as against all other Pipe & Boiler insurers. *See id.* Pursuant to the settlement agreement, on May 19, 2022, the Receiver filed a motion to approve the PBI QSF as a QSF pursuant to federal Treasury Regulations in the Receivership Court. *See* ECF 108-3. Arrowood, whose affiliated companies are parties to the case in which the motion was filed, did not object to the motion in state court. Protopapas Aff. ¶ 42.[1] On May 20, 2022, Chief Justice Jean Toal (Ret.) of the Receivership Court approved the settlement and the PBI QSF as a legally constituted QSF, and maintains continuing jurisdiction over the PBI QSF, which notably includes jurisdiction over any concerns that any party has with the QSF's establishment, function, or related motions and orders. *See* ECF 108-2. On June 13, 2022, Justice Toal also clarified that her May 20, 2022 order confirmed both the Receiver and T&G Solutions, Inc. ("T&G") as the PBI QSF's two members.

---

[1] In the Covil Receivership, Justice Toal welcomed objections to the formation of a QSF from Covil's non-party insurers. In the order establishing the Covil QSF, Justice Toal noted, "[i]f the Objecting Insurers wished to object to the establishment of the Covil QSF or to the approval of these settlements then they were required to seek leave to intervene in these cases. They chose not to do so." Exhibit 2, Order Establishing Covil QSF at 11.

2

See Exhibit 3, Motion to Clarify May 20, 2022 Order; Exhibit 4, Order Clarifying Membership.

With the contribution rights having been vested in the PBI QSF and a South Carolina court having approved the PBI QSF, the Receiver sought the opportunity to amend its complaint in this Court to assert Zurich's contribution rights against Pipe & Boiler's historical insurers in this case.

## Law and Argument

**I. The PBI QSF Is a Valid Legal Entity and Approved QSF that Can and Must Assert Its Rights In this Case to Maximize the Funds Available to Pay Asbestos Claims.**

Putting Arrowood's histrionics aside, the thrust of its Opposition is that the PBI QSF cannot be added as a party to this case because it is a fictitious entity that was not properly "constituted" as a qualified settlement fund. *See* ECF 108 at 6. The ostensible grounds for Arrowood's challenge to the fund's validity are meritless.[2] There is no defect in the PBI QSF, and were there, that would have to be addressed by Justice Toal, whose order approved the QSF and whose Receivership Court maintains "continuing supervision" of the QSF and "all matters related to [that] Order" pursuant to Treas. Reg. § 1.468B-1(c)(1). ECF 108-1 at 11.

The critical fact for purposes of the Motion to Amend is that the PBI QSF is and remains a valid legal entity fully capable of participating in this lawsuit. As a state law matter, it indisputably was formed as an LLC (ECF 108-4), and its Operating Agreement – which identifies **both** the Receiver and T&G as its "Members" – became effective upon Justice Toal's "approval of [the Zurich] settlement agreement" on May 20, 2022, as she has since confirmed (ECF 108-2 at 1; *see also* Exs. 3, 4). The PBI QSF has also received contractual rights to Zurich's settlement funds and its legal rights to assert contribution claims. ECF 108-2 at 1; Protopapas Aff. ¶ 41.

---

[2] These arguments are also dangerous. The PBI QSF exists to protect the insurers' settlement funds from a significant tax burden. Failure of the PBI QSF to serve this function would give rise to sudden and meaningful federal tax liability and would significantly reduce the resources available to compensate future meritorious asbestos claimants.

As already determined by Justice Toal, the PBI QSF has also been constituted as a valid QSF under federal income tax law. The moment the May 20, 2022 order issued, the PBI QSF became – and remains – an established QSF, "***even if that order or approval may be subject to review or revision***" as Arrowood seeks now for the first time before the wrong court. 26 C.F.R. § 1.468B-1(e)(1) (emphasis added); *accord FTC v. QT, Inc.*, 249 F.R.D. 305, 312 (N.D. Ill. 2008).

In reality, the PBI QSF is a valid legal entity tasked with "maximiz[ing]" the insurance assets and income available to pay asbestos claim expenses – including by asserting the contribution rights of Zurich and, if necessary, defending against contribution claims by other insurers that would siphon the insurance recoveries reserved for meritorious asbestos claimants. *See* PBI QSF Operating Agreement, ECF 108-2 at 1 & ¶¶ 1.2, 5.1. The PBI QSF's participation in this lawsuit is proper and essential to asserting its rights and duties to marshal and safeguard assets.

### A.    The Receivership Court Established the PBI QSF as a Valid QSF With T&G As a Member.

Arrowood first contends that the PBI QSF is an improper party because "PBI QSF, LLC, as constituted with T&G as a member [per the Operating Agreement], cannot be considered a qualified settlement fund" because the proposed order endorsed by the Receivership Court mistakenly did not expressly identify T&G as a member. ECF 108 at 6-8.

Arrowood's basic premise is incorrect because T&G *is* a member of the PBI QSF—as Justice Toal agrees. Exs. 3, 4. The PBI QSF's May 19, 2022 Operating Agreement explicitly identifies T&G as a member of the PBI QSF and was considered by the Receivership Court before it issued the May 20, 2022 order approving the fund and the Zurich settlement. *See* ECF 108-2 at 1 (identifying Receiver and T&G as "Members"); ECF 108-3 at 3-4 (May 19 motion to approve qualified settlement fund and settlement attaching Operating Agreement as Exhibit 2); *see also* ECF 108-1 at 8 (May 20 order). It was necessary for the Receivership Court to rely on the

Operating Agreement to confirm, as it did, that the PBI QSF satisfied all requirements for establishing a valid QSF, including that the fund "was established to resolve or satisfy" tort or contract claims, and that "its assets are … segregated from other assets of the transferor (and related persons)." 26 C.F.R. § 1.468B-1(c)(2), (3); *see also* ECF 108-1 at 7 (order finding that "the establishment of the PBI QSF and the transfer of funds to the PBI QSF … comply with the law," including 26 C.F.R. § 1.468B-1(c)). And, by its terms, the Operating Agreement became effective on May 20, 2022 when Justice Toal "approv[ed the Zurich] settlement agreement" through the same order, thereby establishing the Receiver and T&G as members. *See* ECF 108-2 at 1; DEL. C. tit. 6, § 18-301. That is why, when the Receiver requested that Justice Toal clarify the effect of her May 20, 2022 order in light of Arrowood's meritless challenge, she confirmed that T&G is a member of the approved PBI QSF. *See* Exs. 3, 4.

Thus, Arrowood's suggestion that Justice Toal's order somehow stripped the PBI QSF of one of its members and failed to recognize a valid QSF is simply inaccurate: her order effectuated the Operating Agreement naming T&G as a member and found that a valid QSF existed under Treasury Regulations. Indeed, the foremost national expert on QSFs, Robert W. Wood, finds no basis on which the PBI QSF could be considered invalid under governing federal income tax law. *See* Exhibit 5, Declaration of Robert W. Wood ("Wood Decl.") ¶¶ 1, 8-13.

Tellingly, Arrowood's affiliated companies are parties to the action in which the motion to approve the settlement and PBI QSF was filed, but they did not object and Justice Toal approved it. Protopapas Aff. ¶ 42. Further, if Arrowood has a belated objection to the QSF's establishment, it should address that concern to Justice Toal (*see id.* ¶¶ 43-44), who, in any event, has already clarified that T&G is indeed a member of the PBI QSF (Ex. 4). Now that the PBI QSF is duly formed, hers is the court authorized to maintain "continuing jurisdiction" over the QSF. 26 C.F.R.

§ 1.468B-1(c)(1); Wood Decl. ¶ 10. Her court expressly has exercised "continuing jurisdiction" over "all matters related to [the] Order" approving the PBI QSF, which Arrowood collaterally assaults here. ECF 108-1 at 11. Meanwhile, the legal force of Justice Toal's order approving a legally compliant QSF should be duly respected. *See Lanier v. Branch Bank & Trust Co.*, C/A No. 3:12–0628–MBS, 2013 WL 4696138, at *6 (D.S.C. Aug. 29, 2013) ("The state court's decisions are entitled to full faith and credit deference by this court.").

As such, Arrowood's objections that the PBI QSF somehow was not properly "constituted" lack merit. The requirements for establishing a QSF are set forth in 26 C.F.R. § 1.468B-1(c). *See United States v. Brown*, 348 F.3d 1200, 1207 (10th Cir. 2003). They are straightforward and were clearly satisfied here. The only requirement Arrowood tries to challenge is that the fund must have been "established pursuant to an order" of "any" state or federal governmental authority "and is subject to the continuing jurisdiction of that governmental authority." 26 C.F.R. § 1.468B-1(c)(1). The Receivership Court's May 20, 2022 approval order expressly satisfies this element because it is an "order of … a court of law" retaining jurisdiction over the QSF. *Brown*, 348 F.3d at 1208.

Arrowood's challenge to this element misplaces reliance on 26 C.F.R. § 1.468B-1(e)(1). *Cf.* ECF 108 at 8. That provision merely explains that a QSF will not be deemed to exist "prior to the date" that the governmental authority (here the Receivership Court) issues its "initial" order. Nothing in the provision Arrowood cites – nor any other part of the Treasury Regulations regarding QSFs – suggests that a perceived issue with the QSF's *membership* at the time of initial court approval could conceivably mean that a valid QSF was not constituted.

To the contrary, the Treasury Regulations contain no requirements regarding a fund's members. Indeed, many QSFs do not have members and a QSF can even consist of a mere account if its assets are segregated from the transferor's (or related persons') other assets. *See* Wood Decl.

6

¶ 4. LLCs like the PBI QSF are clearly permissible legal entities for QSFs. *Id.* ¶¶ 4-7. And Justice Toal's clarification of her approval order confirming that T&G is a member has no impact on its original validity, as the "initial" order established a valid QSF "even if that order or approval may be subject to review or revision." 26 C.F.R. § 1.468B-1(e)(1); *FTC*, 249 F.R.D. at 312.

There is no conceivable defect with the LLC's formation either. Whatever Arrowood's complaint, the PBI QSF remains (1) a validly formed LLC under prevailing state law, and (2) a valid QSF under federal tax law as of Justice Toal's May 20, 2022 order. *See* Wood Decl. ¶¶ 8-10.

B.     **The Receivership Court Properly Exercised Jurisdiction to Supervise the QSF.**

Arrowood also argues that the PBI QSF is invalid because the Receivership Court – despite its express finding to the contrary – cannot properly exercise "continuing jurisdiction" over a Delaware LLC as required by Treas. Reg. § 1.468B-1(c)(1). *See* ECF 108 at 8-10. But nothing is "inconsistent" with the Receivership Court continuing to supervise the PBI QSF while the PBI QSF respects Delaware corporate formalities. A QSF formed in one jurisdiction is often administered and/or the subject of litigation in another jurisdiction, and the Treasury Regulations make clear that one can form a QSF in one jurisdiction when litigation is pending somewhere else. Wood Decl. ¶ 5. In reality, it is common for QSFs to be formed as Delaware LLCs wherever they may be supervised, and the same is true with QSFs formed as LLCs or trusts in other states. *See* Wood Decl. ¶¶ 4-5, 11-13.; *see also* Exhibit 6, Declaration of Troy L. Chute ("Chute Decl.") ¶ 33.

Courts interpret a statute's or regulation's language "as a whole and [] interpret its words in light of the context," without reaching "an absurd result." *State v. Dawkins*, 573 S.E.2d 783, 785 (S.C. 2002). The Treasury Regulation states that a QSF need only be "subject to the continuing jurisdiction" of "any" court that approves the fund – not exclusive jurisdiction over all conceivable legal issues that may arise. 26 C.F.R. § 1.468B-1(c)(1). And that is precisely what the Receivership

7

Court does through its approval order by retaining "continuing jurisdiction" to supervise the PBI QSF's assets and "matters related to this Order." ECF 108-1 at 11; *see also id.* at 5 n.1 (collecting South Carolina cases confirming court's ability to exercise jurisdiction over "PBI's assets").

Arrowood's implausible construction of the "continuing jurisdiction" requirement would frustrate the Receivership Court's important supervision by requiring that essentially every legal issue confronting the PBI QSF (and any number of other Delaware QSFs) be heard by a Delaware court. *See* Wood Decl. ¶¶ 11-13. This absurd result would be especially damaging here, where the court that approved and supervises of the QSF is also the court that appointed the Receiver, empowered it to marshal Pipe & Boiler assets, and organizes its litigation through the *Barton* doctrine.[3] The Treasury Regulation was not created to *prevent* the Receivership Court from also supervising the PBI QSF, which was created with the "purpose and intent" of achieving the same objective of "maximiz[ing]" assets to satisfy Pipe & Boiler liabilities. ECF 108-2 at ¶¶ 1.2, 5.1.

In fact, the Treasury Regulation's broad terms permit a QSF to be approved and supervised by a court or other governmental authority of "***any*** state (including the District of Columbia)" or even the "United States." 26 C.F.R. § 1.468B-1(c)(1) (emphasis added). Thus, as the preeminent treatise on QSFs expounds, this regulation provides "considerable flexibility" for both selecting a court to approve the QSF and "the level of court involvement" in supervising the fund:

> Which court to choose [to approve and retain jurisdiction over a QSF] is largely a matter of opinion and personal preference. *Any* court with which you feel comfortable that is willing to take jurisdiction over the QSF will suffice. In particular, nothing requires that the court taking jurisdiction over the QSF be the same court in

---

[3] Under the "*Barton* doctrine," the state court that appoints a receiver maintains exclusive jurisdiction over all claims filed by and against that receiver – subject only to the state court's own waiver of that exclusive jurisdiction. *McDaniel v. Blust*, 668 F.3d 153, 156-57 (4th Cir. 2012); *see also Barton v. Barbour*, 104 U.S. 126 (1881). The Order Appointing Receiver expressly embraces the *Barton* doctrine by instructing that the Receiver "may not be sued outside this Court without obtaining the Receiver's consent or an order of this Court prior to doing so." ECF 87-1 at 3.

8

> which the complaint was filed or which has jurisdiction over the prosecution of the case [being settled] …. A court's activities in exercising continuing jurisdiction over a QSF may be minimal and limited to generalized approval for distribution to beneficiaries … as long as the procedures you contemplate are reflected in the [operating] agreement.

Robert W. Wood, *Qualified Settlement Funds and Section 468B*, ¶ 2.3[A] (2009). Arrowood's opinion that only a Delaware court can supervise the PBI QSF is simply incorrect. *See* Wood Decl. ¶¶ 11-13. The Receivership Court has properly exercised "continuing jurisdiction" over the QSF.

        **C.**        **The PBI QSF Does Not Violate the Order Appointing the Receiver.**

Arrowood also argues that the Receivership Court's approval of the PBI QSF violates the Receivership Court's ***own order*** appointing the Receiver. First, Arrowood suggests that the PBI QSF opens up the Receiver to being "sued outside [the Receivership] Court without obtaining the Receiver's consent or an order of [the Receivership] Court prior to doing so," in violation of the order appointing Receiver. *See* ECF 108 at 10 (quoting ECF 87-1 at 3). But the order's recitation of the *Barton* doctrine (*see supra* at page 8, n.3) is meant to organize and regulate litigation against the Receiver (Protopapas Aff. ¶¶ 18-19), not to prevent the Receiver from carrying out the expansive powers the order grants him to marshal assets (ECF 87-1 at 1), including by utilizing a QSF designed to do exactly that. *See* Wood Decl. ¶ 2; Protopapas Aff. ¶¶ 10-11, 38-40.

Next, Arrowood invents another purported violation of the appointment order based on the supposed transfer of partial "ownership" of Pipe & Boiler's assets to T&G. *See* ECF 108 at 11-12. The internal inconsistencies of this argument doom it from the outset. Arrowood contends that "the appointment of a receiver does not change the title or interests of the insolvent entity," indicating the Receiver lacks ownership of Pipe & Boiler's assets, and then accuses the Receiver of "transferring or granting [] ownership" to T&G. *Id.* at 12. Both things cannot be true.

9

More fundamentally, the creation of the PBI QSF – with T&G as a member – is well within the ambit of the Receiver's expansive "***power and authority [to] fully administer all assets of Pipe & Boiler … and take any and all steps necessary to protect the interests of Pipe & Boiler whatever they may be***." Order Appointing Receiver, ECF 87-1 at 1 (emphasis added). The QSF and the Receiver share the same core objective of protecting and maximizing Pipe & Boiler assets to satisfy meritorious asbestos claims. By creating the PBI QSF as a tax-advantaged vehicle to marshal insurance assets, the Receiver has bolstered its ability to achieve that objective. And, as discussed below, T&G's membership in the PBI QSF enhances the fund's pursuit of this objective.

### D.     T&G's Membership Is Proper and Enhances the PBI QSF's Performance.

T&G plays an important role in enhancing the PBI QSF's ability to marshal assets reserved for compensating injured asbestos claimants, against the backdrop of very complex and expanding asbestos defense and insurance recovery efforts. *See* Protopapas Aff. ¶¶ 65-68. T&G is the company of Mr. Troy Chute, the Receiver's trusted advisor who performs critical administrative and strategic functions for the Receiver in connection with this and other South Carolina receiverships, including negotiating with carriers to recover insurance assets. *See* Chute Decl. ¶¶ 7-8, 25-31; Protopapas Aff. ¶¶ 69-70. To carry out these duties, it is critical for Mr. Chute to understand at all times the funds and potential insurance assets available to respond to Pipe & Boiler asbestos suits. *See* Chute Decl. ¶ 36; Protopapas Aff. ¶ 71. T&G's membership in the PBI QSF also enables Mr. Chute to attend meetings with PBI QSF's investment advisor and accountant, and ultimately, take over management of PBI QSF's relationship with the investment advisor in order to allow the Receiver to focus on other matters. *See* Chute Decl. ¶ 35. In other words, the PBI QSF – and the Receiver – can operate more effectively and efficiently to marshal

assets with T&G as a member, while also affording T&G the protection of insurance coverage for its professional services. *See* Protopapas Aff. ¶¶ 72-74.

Importantly, T&G's membership does not mean it has free reign to take or use the PBI QSF's assets for itself. Just the opposite is true. Complying with Treasury Regulations, the PBI QSF maintains "a separate and independent fund." ECF 108-2 at ¶ 1.5; 26 C.F.R. § 1.468B-1(c)(3). The use of PBI QSF assets is strictly bound by its Operating Agreement, which compels that the fund's distributions "shall be made to meet Fund purposes, ***in the discretion of the Manager*** [*i.e.*, the Receiver, not T&G], or to meet any legal obligation of the Fund." ECF 108-2 at ¶ 1.3 (emphasis added). Apart from covering administrative and management expenses, as more fully set forth in Article 1.2 the "Fund Purposes" are tailored to marshaling available insurance assets "to provide funds which may be used to pay for costs incurred" for "PBI Asbestos Suits." *Id.* ¶ 1.2; *see also id.* ¶ 1.5. Nor will T&G be enriched by the PBI QSF's eventual termination: any remaining funds after satisfying existing obligations will be donated to one or more South Carolina universities "operated exclusively for charitable or educational purposes." *Id.* ¶ 3.4 & Schedule 4.

Regardless of who has an interest in a QSF, under governing federal income tax law, any control remains with the trustee or administrator, and ultimately under the supervision of the court. *See* Wood Decl. ¶ 7. Operating the PBI QSF as an LLC with T&G as a member enhances the fund's performance and comports with the accepted usage of QSFs.

**II.    A 28 U.S.C. § 1447(e) Analysis Favors Allowing Plaintiff's Amendment.**

Arrowood acknowledges that 28 U.S.C. § 1447(e) governs the instant motion to amend. *See* ECF 108 at 17. The Fourth Circuit in *Mayes v. Rapoport*, 198 F.3d 457, 462-63 (4th Cir. 1999), recognized the following four factors a court may examine in evaluating whether to allow a plaintiff to amend a complaint to add a non-diverse party: "the extent to which the purpose of the

amendment is to defeat federal jurisdiction, whether the plaintiff has been dilatory in asking for amendment, whether the plaintiff will be significantly injured if amendment is not allowed, and any other factors bearing on the equities."

### A. The PBI QSF Is Not Fraudulently Joined.

The PBI QSF is a newly-created entity that is a necessary plaintiff to this action. As set forth in Plaintiff's Motion to Amend, Plaintiff reached a settlement with Zurich just days before this Court's deadline to file "amended pleadings with a more definite statement." ECF 63. Indeed, Justice Toal only just approved the creation of the PBI QSF on May 20, 2022 – nearly nine months *after* Plaintiff filed its original complaint in this matter. As detailed above, the QSF is the intended transferee and assignee of Zurich's contribution rights pursuant to the recent Zurich settlement. In Pipe & Boiler's Proposed Amended Complaint, the PBI QSF asserts its contribution rights against the remaining insurer Defendants. ECF 87-2. To the extent the PBI QSF must advance funds to resolve certain cases, the majority of such funds are collectible from other insurers. Therefore, the QSF is a necessary party to this action. *See supra* Section I; *see also* ECF 87 at 10-12.

Arrowood bases its fraudulent joinder claim on the "Receiver's timeline," which it argues "readily demonstrates his primary motive, to escape to the state court." ECF 108 at 13.[4] In other words, Arrowood argues "outright fraud." *Id.* at 12. In support, Arrowood relies on a single Central

---

[4] Although Arrowood states that "[t]he fraudulent joinder doctrine applies equally to a fraudulently joined plaintiff as to a fraudulently joined defendant," this is not settled law. *See, e.g., Reeves v. Pfizer, Inc.*, 880 F. Supp. 2d 926, 929 (S.D. Ill. 2012) ("Without contrary direction from the Seventh Circuit, this Court finds that extending the doctrine of fraudulent joinder to joinder of plaintiffs would be … a massive increase to this Court's jurisdiction."); *see also Feeley v. Bayer Corp.*, 18-CV-2090-NJR-GCS, 2019 WL 4261545, at *3 (S.D. Ill. Sept. 9, 2019) (collecting cases and declining to apply fraudulent joinder to joined-plaintiffs); *see also Johnston Industries, Inc. v. Milliken & Co.*, 45 F. Supp. 2d 1308, 1312 (M.D. Ala. 1999) (holding that the doctrine of fraudulent joinder "does not extend to include the alleged fraudulent joinder of a plaintiff."). Plaintiff has not located any cases in which the Fourth Circuit or its district courts addressed whether fraudulent joinder applies to joined-plaintiffs, nor does Arrowood cite any such cases.

12

District of California decision in *Clinco v. Roberts* for the notion that "seeking to amend to add a non-diverse party shortly after removal raises a justifiable suspicion that the removal rather than the evolution of the case precipitated the proposed amendment." *Id*. at 13 (citing 41 F. Supp. 2d 1080, 1083 (C.D. Cal. 1999)). In *Clinco*, defendant removed the case and two days later, plaintiff served the defendant with an amended complaint which the court noted was "substantially similar." 41 F. Supp. 2d at 1083 & n.2 (noting that "[a]part from various editorial differences, the first amended complaint adds a one-sentence allegation to the first cause of action and slightly alters the sixth cause of action."). In addition, the validity of the claims against the new defendants were weak. *See id.* at 1083-86. Under these circumstances, the court noted the possibility of an improper motive. *Id*. at 1083 (stating "one could justifiably suspect that [plaintiff's] amendment of the complaint was caused by the removal rather than an evolution of his case").

Here, by contrast, the constantly evolving circumstances since the filing of Pipe & Boiler's original complaint are the precise reason why Pipe & Boiler is seeking to amend its complaint now. Pipe & Boiler filed its original complaint on August 17, 2021. After the original complaint was filed, the Receiver negotiated a confidential settlement agreement Zurich. The settlement agreement term sheet was signed approximately a month ago, and the formal settlement agreement was executed on May 16, 2022. As a result of that settlement, the Receiver created the PBI QSF. On May 20, 2022, the PBI QSF was formally empowered to initiate operations and take action to pursue Zurich's contribution rights. On May 24, 2022, Pipe & Boiler filed the instant Motion to Amend and Proposed Amended Complaint. ECF 87. In sum, Pipe & Boiler has acted swiftly to bring the QSF before this Court in the face of dynamic circumstances over the past nine months.

Arrowood has failed to satisfy the "heavy burden" of showing fraudulent joinder as to "outright fraud." *See McCoy v. Liberty Mut. Ins. Co.*, No. 721CV01508DCCJDA, 2021 WL

13

7541174, at *9 (D.S.C. Sept. 2, 2021), report and recommendation adopted, No. 7:21-CV-01508-DCC, 2022 WL 487006 (D.S.C. Feb. 17, 2022); *see also Sims v. Ryder Truck Rental, Inc.*, No. 5:16-CV-01025-JMC, 2016 WL 6155741, at *2 (D.S.C. Oct. 24, 2016) (explaining that the court was "not convinced that this reason demonstrates outright fraud on the part of Plaintiff" where defendant argued its co-defendant was fraudulently joined since plaintiff had taken no action to enter default against the co-defendant and plaintiff allegedly had no intention to obtain a joint judgment against it). As to the second showing, Arrowood has not demonstrated (or even suggested) that there is *no possibility* that Plaintiff could establish a cause of action against the individual Defendants in state court. Accordingly, joinder is proper.

### B.    Plaintiff Is Not Dilatory In Seeking This Amendment.

The Receivership Court entered its order approving the establishment of a qualified settlement fund for Pipe & Boiler on May 20, 2022. ECF 108-1. Just four days after the PBI QSF was formed, on May 24, 2022, the Receiver filed its motion to amend. ECF 87. The four-day gap between the approval order and the Receiver's motion to amend cannot be considered dilatory.[5]

### C.    Plaintiff Will Be Injured If Amendment Is Not Allowed.

Plaintiff has been forthright with the Court that it would prefer to litigate this action in South Carolina state court because the Receivership Court has deep familiarity with these matters garnered from almost four years of receivership litigation. The Receiver will not address the heated accusations made by Arrowood on this topic except to note that the PBI QSF is not asserting rights as a third-party administrator – it is asserting Zurich's contribution claims. Upon settlement with

---

[5] While Arrowood does not contend that the Receiver was dilatory, Aon does accuse the Receiver of dilatory behavior because the "QSF was created on April 25, 2022, per the Delaware's Secretary of State's Website." ECF 107 at 13. Though the limited liability company was created on that date, the actual QSF was not statutorily approved by the Receivership Court until May 20, 2022.

14

Zurich, the PBI QSF was charged with asserting Zurich's contribution rights as against Pipe & Boiler's other insurers.[6] Arrowood argues that the Receiver "does not state that Zurich paid any Pipe & Boiler related liability that would provide the basis for a contribution right." ECF 108 at 15. At the same time, Arrowood itself has filed a cross-claim against Continental in this case for, among other causes of action, a declaration of *contribution* rights for future asbestos personal injury claims. *See* ECF 18 at 15-18. Like all others of Pipe & Boiler's insurers, including Arrowood, Zurich has contribution rights as against the other Pipe & Boiler insurers, and determining those is crucial to determining whether and how to allocate insurance coverage among policies for any future individual asbestos personal injury action against Pipe & Boiler. The Receiver will be prejudiced if the PBI QSF is unable to assert these newly acquired rights in this Court to pursue and preserve funds to satisfy Pipe & Boiler liabilities.

D.     **Other Factors Bearing on the Equities Support Joinder of the PBI QSF.**

The PBI QSF should be permitted to assert Zurich's contribution claims against Pipe & Boiler's historical insurers in the same case that Arrowood is permitted to assert its own contribution claims against Pipe & Boiler's other historical insurers. This is critical to the QSF's mission to marshal and safeguard insurance assets for payment to meritorious asbestos claimants.

## CONCLUSION

For the foregoing reasons, Pipe & Boiler respectfully requests that this Court grant its Motion to Amend.

---

[6] The settlement between Zurich and Pipe & Boiler in this case follows the same terms related to contribution claims as did the settlement between Zurich and Covil. In the order approving the Zurich settlement, the Court noted: "Consistent with Zurich's limited assignment of contribution claims to Covil and the Covil QSF, claims for contribution, indemnification, subrogation, or otherwise against Zurich made by otherwise against Zurich made by other insurers of Covil are directed solely to the Covil QSF." Exhibit 7, Order Approving Covil and Zurich Settlement at 8.

15

        Respectfully submitted,

        s/Robert E. Sumner, IV
        Robert E. Sumner, IV (Fed. ID. No. 10215)
        Joel A. Berly, IV (Fed. ID No. 13101)
        BUTLER SNOW, LLP
        25 Calhoun St., Ste. 250
        Charleston, SC  29401
        Telephone:  843/277-3700
        Facsimile:   843/277-3701
        robert.sumner@butlersnow.com
        jay.berly@butlersnow.com

        G. Murrell Smith, Jr. (Fed. ID No. 6120)
        Jonathan M. Robinson (Fed ID No. 7755)
        Shanon N. Peake (Fed ID. No. 13051)
        SMITH ROBINSON HOLLER DUBOSE
        AND MORGAN, LLC
        2530 Devine Street
        Columbia, South Carolina 29205
        Telephone: 803/254.5445
        jon@smithrobinsonlaw.com
        murrell@smithrobinsonlaw.com
        shanon@smithrobinsonlaw.com

        Brian M. Barnwell (Fed. ID No. 10624)
        RIKARD & PROTOPAPAS, LLC
        2110 N. Beltline Blvd.,
        Columbia, South Carolina 29204
        Telephone:  803/978.6111
        bb@rplegalgroup.com

June 14, 2022        ***Attorneys for Plaintiff***